WALTERS *v.* WOLVERINE PORTLAND CEMENT CO.

1. MASTER AND SERVANT—PERSONAL INJURIES—ASSUMED RISKS.

An employé in a cement factory was given two wrenches and told to tighten the bolts in a tube mill which was not running, and in doing so he lost an arm by reason of a wrench slipping on the bolt and allowing him to fall backward on a similar mill in operation adjoining. He was a man of mature years, in possession of all his faculties, familiar with machinery, had worked in the mill two months, and it was not claimed that he was not acquainted with the use of wrenches or that those given him were defective. The factory was sufficiently light and the mills of simple construction. *Held*, that the employer was not liable for the injury, the employé having assumed the risk.

2. SAME—EVIDENCE.

That the brightness of the surface of the mill upon which the employé was injured rendered it impossible, when looking from a certain direction, to observe that the mill was running, was immaterial, when he testified that he did not look at it, that he was directed to work at the mill which was not running, and that he selected the one not running without difficulty.

3. SAME—GUARDING MACHINERY—CUSTOM.

It is not negligence to fail to guard certain machinery in the absence of a custom to guard machinery of that character.

Error to Branch; Yaple, J. Submitted April 11, 1906. (Docket No. 52.) Decided May 18, 1907.

Case by Frank Walters against the Wolverine Portland Cement Company for personal injuries. There was judgment for defendant on a verdict directed by the court, and plaintiff brings error. Affirmed.

*Newberry & Humphrey*, for appellant.

*H. H. & B. E. Barlow*, for appellee.

MCALVAY, J. Plaintiff brought suit for personal in-

juries received while employed in and about defendant's cement plant, claimed to have been caused by the negligence of defendant. Defendant was engaged in the manufacture of Portland cement in Branch county. That department of the plant in which plaintiff was employed was known as the "wet end." It is upon the ground floor, and is a space about 75 feet long by 75 feet wide. Over the east end of this space is what is called the "clay floor," under which plaintiff and the other workmen changed their clothing before going to work. Next to this, going west from the east end, is a "slurry vat," made of concrete. It is about ten feet wide east and west, 48 feet long, and 8 feet deep. The walls of the vat rise about 2 feet above the level of the ground floor. "Slurry" is a mixture of clay and marl, of a grayish color, and is like thin mud. This vat was usually full, or nearly full, of this mixture. Directly west of this vat is another vat, 12 feet in width and of like length and depth as the first one. These vats are separated by a heavy concrete wall 6 feet 8 inches thick on its upper surface. About 25 feet from this second vat, and where plaintiff usually worked, were several "slurry" tanks and pumps for pumping the slurry into them, and farther away in the west end of the factory was another row of tanks.

The tube mills, upon one of which plaintiff was injured, are located over the vat first described. There is a battery of five of them placed side by side in a row; their ends supported on wheels, called "trunnions," fixed on bases on top of the east and west walls of the vat. These mills are hollow iron cylinders 16 feet long and 5 feet in diameter, weighing several tons each. They are partially filled with stones, and are used to grind and mix the slurry as they revolve. The west end or head of each of these mills is a heavy iron plate, and is removable. It is fastened to the cylinder by means of bolts through the plate and through a flange on the end of the cylinder. These are $\frac{7}{8}$-inch bolts, 5 inches long, with right-handed thread, and hexagonal heads and nuts. There are 12 bolts in each

head.   The holes in the flange and head which receive the bolts being round, it is necessary to use two wrenches to tighten the nuts.   Eight inches from the west end of each cylinder or mill is a heavy iron tire or band 8 inches wide, which runs on the trunnions or wheels which support it. The trunnions are 2 feet in diameter with 8-inch faces. The constant wear of the tires of the mills upon the faces of the trunnions has caused the surface of both to become highly polished.   The trunnions are supported by bases 2 feet 6 inches long, upon which are boxes for the bearings of the trunnions.   About one-half of the trunnion is concealed by the bases and boxes.   The cylinders run at the rate of 24 revolutions, and the trunnions at the rate of 70 revolutions, per minute.   The height of the tube mills from the cement foundation on which they rest is 6 feet 9 inches.   The distance between the nearest points on the separate mills is 3 feet 9 inches.   The distance between the nearest points of the trunnions of the separate mills is 28 inches, and between the nearest points of the bases 21 inches.   The accompanying cut drawn to scale shows two of the mills.

These vats are usually filled or partly filled with "slurry," and there was always more or less mud upon the floor and walls of the vats.   As we understand it, the mud was taken from the first vat, passed through the tube mills, and discharged into the second vat.

Plaintiff at the time of his injury was 41 years of age. He had worked on a farm until he was nearly 30 years old, and then for six years worked as a section hand on a railroad.   Later he worked in and about a flouring mill for six years at packing flour and feed and nailing barrels.   On March 18, 1902, he was employed by defendant. He went to work in the west end of the factory as a common laborer, wheeling mud, watching the tanks to keep them from running over, oiling the pumps, and running errands, as directed by Mr. Burkholder, who had charge of that department of the work.

On June 4, 1902, at about 8 o'clock in the forenoon,

plaintiff was in that part of the factory under the clay floor. Burkholder handed him two wrenches and told him to "go and tighten the bolts on the head of that mill standing still, and do it quick, because we are in a hurry. We are getting behind on the mud." He took the wrenches, and went from the east, between the dead mill

and the one north of it, which was running, walking on a plank about a foot wide, towards the west, until he came to the west end, turned south, and passed in front of the west end of the dead mill, and turned in between that mill and the one next south of it, facing to the side of the head of the dead mill upon which the bolts were to be tightened. This mill was standing still, or "dead," as it is called. It was the third mill counting from the south. All the other mills were running. He saw that the fourth mill was running when he went between it and the dead

mill.  He was told to tighten the bolts on the mill that was standing still.  He says he did not notice that No. 2 was running.  Plaintiff started to tighten the bolts, and had worked about five minutes.  He used the two wrenches, pulling up on one and pushing down on the other, while doing this.  To use his words: "The bolt slipped in the wrench, and jerked—gave me a sudden jerk, and my feet slipped, and I went on my back."  His arm was caught between the trunnion and tire on the tube mill behind him and was cut off.  He was otherwise seriously injured.

At the close of plaintiff's case defendant moved that the court direct a verdict in its favor, on the ground that the evidence was not sufficient in law to warrant a recovery. The court, in granting such motion, gave his reasons as follows:

"In an action of this kind the employé's knowledge or ignorance of a risk may be a factor which of itself, and, without any reference to the quality of the employer's conduct, furnishes or supplies the test for the determination of the employé's right of action.

"If the employé knows of the dangers of the premises or place of work, or with the exercise of ordinary care— that is, such care as an ordinarily prudent man would exercise over his own affairs under like circumstances— could see and understand them he assumes the risks which arise therefrom.  If the plaintiff knew of the dangers of his place of work or by the exercise of reasonable care and caution in the discharge of his duties would or could have known of it then there could be no recovery in this case.  He could not go blindly about his work.  He was required to use his senses.  It is a man's duty to exercise his common sense in his employment.

"The plaintiff was at the time of his employment and at the time of the accident a man of mature age experienced in life and in the full possession of his faculties having capacity to understand and appreciate the dangers which were patent and obvious to a person of ordinary intelligence; and in so far as he knew or ought in the exercise of reasonable care to have known the risks and dangers of the work he is deemed to have accepted and assumed those risks and dangers and this whether the

work was outside of the scope of his regular employment or not.

"The plaintiff had been in the employ of the defendant in and about the factory for some time before the accident. He had prior experience in the particular work of tightening bolts I think while he was in the employ of the railroad company. The place in the factory where he had worked, and the kind of work which he had performed, while in the employ of the defendant, was such as to challenge his attention to the situation of the premises. The location and character of the machinery, the existence and operation of the tube mills, their proximity to each other, their liability to be in operation at any time, and the fact that he understood that some of them were in operation at the time he went to do the work he was engaged in when the accident occurred—generally, the dangers to be expected—all these things were and had been right in front of him in his line of vision, and he must be held to have known what his eyes would have told him if he had used them. There is nothing in the evidence to show that the exigencies of the work he was doing were such as to excuse him, or relieve him from the duties imposed upon him by the law. Although the defendant company may have been negligent in leaving the machinery of the mills uncovered and unguarded, negligent in the respects charged and relied upon in the declaration filed in the case, still the danger arising from the tube mills adjoining the one where he was working was one which, under his own testimony, he knew, or ought to have known in the exercise of ordinary care. The fact that plaintiff sustained serious and permanent injuries, injuries of a character which enlist the sympathies of all, does not alone furnish sufficient ground for his recovery in this action. As I view it, the evidence is insufficient under the law to entitle the plaintiff to recover, and the jury are directed to return a verdict for the defendant."

The plaintiff assigns error upon this action of the court and specifically alleges that the court erred in its findings and instructions to the jury as follows:

"1. That the plaintiff, from the length of his employment with the defendant, the place in the factory where he had worked, and the kind of work which he had performed, must be presumed to have known and appreciated the dangers to be expected in the work he was en-

gaged in at the time of his injury and assumed the risk.

"2. In holding that there was nothing in the evidence to show that the exigencies of the work he was doing were such as to excuse him, or relieve him from the duties imposed upon him by law.

"3. In holding that, although defendant might have been negligent in leaving the machinery of the mills uncovered and unguarded in the respects charged and relied upon in plaintiff's declaration, still the danger arising from the tube mills adjoining the one where he was working was one which under his own testimony he knew, or ought in the exercise of ordinary care to have known.

"4. That the court erred in not submitting to the jury the question of defendant's negligence in permitting mud and slurry to remain upon the surface of the abutment where the plaintiff was sent to work, thus rendering it slippery and unsafe, as charged in the declaration, and in failing to caution and warn him of the dangers of the place where the work was to be done.

"5. That the court erred in not submitting the question of defendant's negligence in giving the order which was given to plaintiff, when it had knowledge that the adjoining mills were in operation and the abutment was slippery, and that the work he was ordered to do was outside of the usual scope of his employment.

"6. That the court erred in not submitting to the jury the question whether plaintiff knew and appreciated, or ought to have known and appreciated, the danger to be encountered by him in the performance of the work he was directed to do, and whether such danger was so apparent and imminent that a person of average prudence and intelligence would have declined under the circumstances to comply with the order."

Plaintiff had worked in this department $2\frac{1}{2}$ months, passing near the tube mills every day. These mills were running most of the time, and were not complicated machinery. Plaintiff had on two occasions, when the mills were not running, assisted in removing the stones from the third mill and in replacing them. A man of ordinary intelligence could not approach these mills and look at them from either end, whether they were still or running, without observing the trunnions upon which

they turned. One-half of the trunnions was always visible above the bases, except when one of the mills was being cleaned out. Then plank was put in front of it, up to the lower rim of the mill, to prevent stones from falling back into the vat. The extreme ends of the bases under the individual mills were 21 inches apart, the rims of the trunnions 28 inches, and the least distance between any part of the cylinders was 3 feet 9 inches. There was ample space to pass between and around the mills by a person using ordinary care.

This was, from the necessities of the business, the wet end of the factory. Nothing was handled but mud, and, of necessity, there was more or less mud everywhere. Plaintiff's employment was mostly with tanks filled with mud by pumps, and his business was to see that they did not overflow. Plaintiff says he was directed to go to the mill which was standing still and tighten the bolts in the head. This challenged his attention to the fact that the others were running, a fact which was apparent to him, because he selected without further direction and went to work at the dead mill. He says he knew No. 4 was running when he went between 3 and 4; but paid no attention to No. 2; that he walked in there without seeing that mill at all; that he looked only at the bolts he was to go to work on.

Plaintiff was a man of mature years, in the possession of all his faculties. It is not claimed that he was not acquainted with the use of wrenches, or that the ones given him were defective. He had worked six years in a flour and feed mill, and so informed defendant's superintendent when he was hired. The accident occurred in the middle of the forenoon of June 4th. The light, although not very good, was sufficient on an ordinary summer day to see the trunnions, according to plaintiff's testimony, at least 6 feet, and the tube mills 25 feet, away. This machinery was not complicated. It was, in fact, of the simplest construction. It was in all respects open, apparent, and visible to any person of ordinary intelligence.

The rule of law is that an employé assumes all risk of accident from defects or dangers which are open, visible, and apparent. Bailey on Master's Liability for Injuries to Servant, p. 220, and cases cited; *Gavigan* v. *Railway Co.*, 110 Mich. 73; *Hathaway* v. *Milling Co.*, 139 Mich. 708. And this is true, whether within or without the regular scope of his employment. Both cases last cited were where the employé was directed to work outside of the scope of his employment. In the *Hathaway Case* Justice OSTRANDER, speaking for the court, said:

"Plaintiff was 28 years old, sound, and in possession of all his faculties. The room in which he was injured was properly lighted. There was no defect, hidden or other, in the machinery. The work he was doing was in itself neither difficult nor dangerous, and to perform it properly and safely required only ordinary care. Whatever danger there was, was visible. The result likely to follow contact of clothing or person with the cogwheels was evident. We do not discover any testimony in the record warranting an inference that any instruction or cautionary suggestion from the superintendent would have afforded plaintiff any better knowledge of the danger to be apprehended from the cogwheels than was afforded by merely looking at them."

No words could more appropriately fit the case under consideration. Whatever danger there was of injury from this machinery was perfectly apparent to any one using ordinary care, and he must be held to have assumed the risk. His injury was the result of an accident caused by the slipping of the wrench he was using.

It is urged that, on account of the brightness of the surface of the trunnion and the tire on the mill, the fact that a mill was running could not be told when looking at this surface, for the reason that they appeared to be the surface of one large wheel. This appears from the record to be true, if looking directly at them from a point having their surfaces in perfect alignment; but the testimony of plaintiff is that he did not look at all at the mill on which he was hurt. He gave no attention whatever to the place

where he was working, although his attention had been directed to the fact that all the mills but one were running, and he selected that one without difficulty.

Negligence is alleged because these trunnions were not protected by guards. There is no proof in the case that it was customary to put guards upon machinery of this character. The court was not in error in directing a verdict for defendant.

The judgment of the circuit court is affirmed.

CARPENTER, GRANT, BLAIR, and MOORE, JJ., concurred.